**In re Gregory M. DZIENDZIEL and Kristine L. Dziendziel, Debtors.**

No. 03–20536.

United States Bankruptcy Court,
W.D. New York.

June 18, 2003.

Raja N. Sekharan, Chamberlain, D'Amanda, Oppenheimer, Rochester, NY, for debtors.

## DECISION & ORDER

JOHN C. NINFO, II, Chief Judge.

### BACKGROUND

On February 18, 2003, Gregory M. and Kristine L. Dziendziel (the "Debtors") filed a petition initiating a Chapter 13 case. On the Schedules and Statements required to be filed by Section 521 and Rule 1007, the

Debtors indicated that: (1) they were the joint owners of a residence located at 36 Exeter Place, Rochester, New York (the "Exeter Residence"), which had a fair market value of $98,000.00; (2) Citimortgage, Inc. held a November 26, 1997 first mortgage on the Exeter Residence, which had a balance due of $103,417.00 (the "First Mortgage"); (3) Evergreen Federal Credit Union ("Evergreen") held a July 31, 2001 home equity loan second mortgage on the Exeter Residence, which had a balance due of $9,827.00 (the "Evergreen Mortgage"); (4) they were the joint owners of a 1999 Honda Odyssey (the "Honda"), which had a fair market appraised value of $14,357.00; and (5) Evergreen held a secured automobile loan for the Honda, which had a balance due of $16,492.00.

On March 3, 2003, the Debtors filed a motion (the "Valuation Motion") which requested that the Court: (1) determine that the Evergreen Mortgage was totally unsecured, and, pursuant to the decision of the United States Court of Appeals for the Second Circuit (the "Second Circuit") in *In re Pond*, 252 F.3d 122 (2d Cir.2001) ("*Pond*"), avoid the lien of the Evergreen Mortgage; and (2) value the allowed secured claim of Evergreen in the Honda at $14,357.00, pursuant to the decision of the United States Supreme Court in *Associates Commercial Corporation v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) ("*Rash*").

In support of the Valuation Motion, the Debtors attached: (1) a copy of a brokers price opinion (the "Brokers Opinion"), prepared by Ulysses M. Grant ("Grant"), an agent with Witt Realty, that indicated an anticipated sale price for the Exeter Residence, as of January 14, 2003, of $98,000.00; and (2) a copy of a February 5, 2003 appraisal (the "Honda Appraisal"), prepared by John Plakus ("Plakus") of Wahl Appraisal Adjusting, Inc. ("Wahl"), that found the loan value of the Honda to be $14,357.20.

On May 17, 2001, Evergreen interposed Opposition to the Valuation Motion which included: (1) a copy of a July 29, 2001 appraisal prepared by H. James LeRoy ("LeRoy") of Lakeside Appraisal Services, that found the fair market value of the Exeter Residence to be $115,000.00; and (2) a copy of the relevant portion of the N.A.D.A. Guide which indicated that the loan value for the Honda was $14,100.00 and the retail value was $18,275.00, resulting in a midpoint valuation of $16,703.00.

On May 21, 2003, the Court conducted a trial on the Pond motion at which the debtor, Kristine Dziendziel, Bruce Witt ("Witt"), LeRoy and Plakus testified.

At trial, Kristine Dziendziel testified that: (1) the Debtors had purchased the Exeter Residence on November 26, 1997 for $109,900.00; (2) the Residence was well maintained and the Debtors had upgraded the siding; (3) the Residence had four bedrooms, 1.75 baths, a living room and an in ground pool; (4) in July 2001, the Residence was appraised for $115,000.00 in connection with the closing of the Evergreen Mortgage, which she believed was a generous value, probably because they were longtime members of the credit union; (5) if she had to list the Exeter Residence for sale, she would list it for $101,000.00 in the hopes of obtaining an offer of between $98,000.00 and $100,000.00, since all the recent sales in the neighborhood that she was aware of were for purchase prices of $102,000.00 or less; and (6) even though they thought the Residence was worth less than $100,000.00 in 1997 when the Debtors purchased it they agreed to the $109,900.00 purchase price because the seller paid $3,000.00 toward their closing costs.

At trial, Witt testified that: (1) he was a realtor with 17 years experience; (2) al-

though he was not an appraiser, he had taken 28 hours of courses on appraising within the past three years; (3) although he had not prepared the Broker's Opinion, he had reviewed it in detail with Grant who had been a realtor for 14 years, and Witt himself had personally inspected and photographed the Exeter Residence; (4) he believed that the Residence would sell for between $95,000.00 and $97,000.00, based upon its condition and his review of the adjusted comparable sales included in the Brokers Opinion; (5) the value of the Residence was negatively impacted by: (a) the bathrooms not being updated; (b) some problems with the hardwood floors; (c) pet odor issues; (d) the poor condition of one of the fireplaces; and (e) leakage; (6) also impacting negatively on the value of the Residence were the facts that: (a) the Debtors had converted the garage into a family room/storage room, which, although it created additional living and storage space, negatively impacted the value of the Residence that would have retained a greater value with the garage in that neighborhood; and (b) the Residence had an in ground swimming pool, which for many buyers was a negative; (7) although the Debtors purchased the property for $109,900.00 in 1997, and it was assessed for $107,500.00, the Residence was suffering from functional obsolescence because of the pool and the converted garage; (8) buyers often overpaid for properties in the seller's market area where the Residence was located, because the homes were starter homes purchased by people without much money; and (9) even though LeRoy had determined that the square footage of the Residence was 1558 square feet, and Witt had utilized the assessor's square footage of 1442 square feet, this 116 square foot difference did not affect the value of homes of this general size and in the price range of the Residence.

At trial, LeRoy testified that: (1) in his appraisal he believed that the existence of the Debtors' in ground swimming pool warranted a $5,000.00 upward adjustment; (2) he disagreed with Witt that a second fireplace in a home does not warrant an upward adjustment; (3) the fact that the Exeter Residence was situated on a corner lot with a relatively large side lot for the neighborhood contributed to his $115,000.00 valuation, as set forth in his March 27, 2003 appraisal (Defendant's Exhibit "B" at Trial); (4) his analysis of property values in Henrietta, and in the surrounding towns of Gates and Chili, indicated that property values were increasing in the range of three to four percent; and (5) a 116 square foot difference in the size of homes like the Residence had a significant effect on value.

At trial Plakus testified that: (1) as an appraiser in the automobile business since 1969, his procedure was to inspect a vehicle to determine its overall condition and what options it had, and then, by utilizing the Valuemate software program, which is a composite of the N.A.D.A. and Red Book values, determine the value after making an adjustment for the necessary costs to repair any existing damage or other problems; and (2) his value of $14,357.00 reflected a deduction off retail for reconditioning costs of $200.00, necessary existing damage repair costs of $900.00, and a $2,000.00 dealer's cost for a warranty.

## DISCUSSION

### I. *In re Pond*

█ The Second Circuit in *Pond* held that a wholly unsecured claim, otherwise secured by a mortgage on a debtor's residence, is not protected under the Chapter 13 anti-modification provision of Section 1322. Therefore, if there is no equity in a debtor's residence after accounting for other encumbrances that have priority over a

mortgage lien, that lien can be avoided and the mortgage debt treated as unsecured.

## II. *Pond Valuation Proceedings Overview*

█ In a *Pond* valuation proceeding, the anti-modification provision set forth in Section 1322 places the burden upon the debtor to demonstrate that there is not even $1.00 of value over prior valid liens to support the mortgage lien to be avoided.

█ The debtor's burden will naturally be higher, in that the Court will scrutinize the evidence more carefully, when: (1) it appears that there is equity available to support the mortgage that is to be avoided at the time it was executed; (2) the alleged value deficiency may have been created in part because of a debtor's failure to make payments on superior mortgages, or to pay obligations such as real estate taxes and water bills which become a superior lien on the property; and (3) the alleged value deficiency is not substantial.[1]

█ *Pond* valuation proceedings in the Rochester Division of the Western District of New York are authorized to be brought initially by motion (a *"Pond* Motion") under the Court's default procedures. Since the May 2001 decision of the Second Circuit in *Pond*, 91.9% of the 272 *Pond* Motions filed in the Division have been granted by default. When opposition is interposed to a *Pond* Motion that provides some creditable evidence that there is equity to support the mortgage to be avoided, the Court sets the matter down on its Evidentiary Hearing Calendar and schedules a trial date.

█ In preparing for the *Pond* trials that the Court has conducted to date, it has become clear that many times the pleadings have not included the following information, which would be very helpful to the Court in both preparing for trial and determining whether a pre-trial conference might assist the parties in narrowing the underlying issues or even settling the matter:

1. The original date and purchase price of the residence;

2. The current assessment for the residence;

3. Information regarding any appraisal that was obtained at the time the mortgage to be avoided was approved, including, who prepared it, what was the indicated value, and who obtained it;

4. If the fair market value asserted by the debtor is less than the original purchase price of the residence, relevant facts and circumstances that would justify an opinion that there has been a decrease in value; and

5. If they are not, an explanation for any disagreement by the parties' appraisers as to the basic facts such as: (a) the square footage of the residence; (b) the square footage of the lot; and (c) the number of rooms, including bathrooms and bedrooms.

In the future, the Court will expect the debtor in opposed *Pond* Motions to supply the Court with this information, in writing, at least two business days prior to the Evidentiary Hearing Calendar.

## III. *The Exeter Residence*

█ I find that the Exeter Residence has a current fair market value of at least $103,500.00, which exceeds the outstanding balance due on the First Mortgage of $103,417.00. Therefore, the Evergreen Mortgage cannot be avoided under Section

---

**1.** *See In re Fisher,* 289 B.R. 544 (Bankr. W.D.N.Y.2003).

506 and the decision of the Second Circuit in *Pond*.

The following credible evidence presented at trial supports the finding that the Exeter Residence has a value of at least $103,500.00, which exceeds the applicable balance due on the First Mortgage: (1) the Debtors purchased the Exeter Residence in 1997 for $109,900.00, which, even with the sellers paying $3,000.00 of the Debtors' closing costs, indicates a 1997 value of $106,900.00; (2) the Residence is currently assessed for $107,500.00; (3) the testimony of LeRoy, a licensed appraiser, was more credible than the testimony of Witt, a realtor, especially with respect to: (a) the positive impact on value due to the in ground swimming pool;[2] (b) the positive impact on value due to the additional 116 square feet not accounted for in the Brokers Opinion or the Opinion of Value that Witt testified to; (c) LeRoy's analysis to support his opinion that there had been an increase in the value of properties in the neighborhood over the last several years; (d) LeRoy's selection of comparable sales; (e) the positive impact on value due to the Residence being on a corner lot; and (f) LeRoy's explanation for why 69 Hollybrook Road was not a credible comparable sale; and (4) there was not a sufficient explanation offered by the Debtors or Witt for why the value of the Residence would have dropped from an adjusted value of $106,900.00 in 1997 to a value of less than $103,500.00 at the time of trial, given: (a) the upgraded siding; (b) the record low mortgage interest rates in existence at the time of trial; (c) LeRoy's testimony and analysis that property values in the area were increasing; and (d) Witt's testimony

that buyers often overpay for properties in the area.[3]

Although when adjusted the various comparable sales used by LeRoy and Witt might not justify a $115,000.00 fair market value, in the Court's opinion, as adjusted, they indicate a value of at least $103,500.00.

Based upon the foregoing evidence, the Debtors have not met their burden to demonstrate that there is no value in the Residence over the First Mortgage, so the Evergreen Mortgage cannot be avoided.

## IV.  *The Honda*

We know from the Decision of the United States Supreme Court in *Rash* that: (1) when a debtor in Chapter 13 proposes to retain a motor vehicle and pay the "cramdown" value of the vehicle through a plan pursuant to Section 1325(a)(5)(B), the Section 506(a) value of the secured claim is the price that a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller; (2) this "Replacement Value," which must be determined on a case-by-case basis, is not the foreclosure value of the property, since the debtor will be retaining and using it, nor is it the midpoint between the foreclosure and retail values; (3) whether Replacement Value is the equivalent of retail value, wholesale value or some other value will depend upon the type of debtor and the nature of the property; and (4) where the proper measure of the Replacement Value of the vehicle is the retail value, an adjustment to that value may be necessary so that a creditor does receive portions of the retail

---

**2.**  Plaintiff's Exhibit 9 at trial includes a picture of the Exeter Residence backyard and the in ground pool which is very attractive.

**3.**  Given these factors, in the Court's opinion, the transformation of the garage into a family

room/storage area and the few minor condition issues that Witt testified to could not have resulted in a decrease in value to a value below $103,500.00.

price that reflect the value of items which the debtor does not receive when he retains the vehicle, including warranties, inventory storage charges and reconditioning costs.[4]

 The Honda Appraisal, Plaintiff's Exhibit 11 at trial, appraised the loan value of the Honda, which Plakus indicated at trial was essentially a wholesale value, was helpful in determining the Replacement Value of the Honda, as required by *Rash*, only in that it established the $900.00 cost to make the necessary repairs to the Honda which would bring the condition of the vehicle up to used car dealer standards.[5]

At trial, Plakus testified that he believed that, if sold privately, the Debtors could obtain $15,423.00 for the Honda. This was based upon a retail value of $18,523.00, less a $200.00 reconditioning cost, a $900.00 repair cost, and a $2,000.00 dealer warranty cost. I find the testimony of Plakus, that the value of a used car dealer warranty for a 1999 Honda Odyssey is $2,000.00, not to be credible.

I find that the Replacement Value of the Honda, based in part upon the testimony of Plakus and in part upon valuation information the Court has obtained in other motor vehicle valuation hearings, to be $16,673.00. This Replacement Value represents a retail value of $18,523.00, less a $200.00 reconditioning cost, a $900.00 repair cost, a $250.00 cost for a dealer warranty and a $500.00 profit, which is one-half of a used car dealer anticipated profit of $1,000.00 per vehicle. I believe that the Debtors would be able to sell the Honda privately for this amount, or obtain a similar Honda for this price in a private sale.

---

4. *See In re Maye*, Chapter 13 Case No. 99–23947 (W.D.N.Y. August 14, 2000) (*"Maye"*).

5. In *Maye*, a different appraiser from Wahl testified on behalf of the lienholder. He had prepared an appraisal which at least attempted to determine the Replacement Value of the

## CONCLUSION

The *Pond* Motion is in all respects denied, and the Chapter 13 Trustee shall place the Debtors' case back on the Confirmation Hearing Calendar.

Since the Replacement Value of the Honda is $16,673.00, the allowed secured claim of Evergreen, as a lienholder, is $16,492.00.

**IT IS SO ORDERED.**

vehicle in that case. For *Rash* valuation hearings, the parties should obtain Replacement Value appraisals and their experts should be prepared to testify to and answer questions regarding Replacement Value.