**Mark BOYCE, Plaintiff–Appellant,**

**v.**

**SOUNDVIEW TECHNOLOGY GROUP, INC. (formerly known as Wit Capital Group, Inc.), Defendant–Appellee.**

**Docket No. 05–1685–cv.**

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 2005.

Decided Sept. 29, 2006.

Thomas A. Reed, Boston, MA (Holtz and Reed, LLP; Frederick R. Kessler, Wollmuth Maher & Deutsch LLP, New York, NY, of counsel), for Plaintiff–Appellant.

Kevin T. Rover, Leza M. DiBella, New York, N.Y. (Morgan, Lewis & Bockius LLP, of counsel), for Defendant–Appellee.

Before: OAKES, POOLER, and SOTOMAYOR, Circuit Judges.

OAKES, Senior Circuit Judge:

Appellant Mark Boyce ("Boyce") appeals a jury's damages award, based on the breach of a stock option agreement, arguing that because of erroneous evidentiary rulings and erroneous jury instructions by the district court, the damages awarded are less than those to which Boyce is entitled.

For the reasons stated below, the damages judgment is vacated and the case remanded for a new trial on damages consistent with this opinion.

## I. *Background*

### A. Boyce's Employment with Defendant–Appellee

Plaintiff–Appellant Boyce is a former consultant of Defendant–Appellee Wit Capital Group, Inc.[1] ("Wit" or "the Company"), a company established to be the world's first investment bank and brokerage firm dedicated to arranging the offering and trading of securities through the Internet. Wit was founded in April 1996 by Andrew Klein, a former securities lawyer. Boyce began his consultation work for Wit on February 20, 1997. Like other employees of the Company, to entice him to join and in lieu of a large salary, Boyce was offered a stock option agreement in the Company as part of his compensation package. Stock option agreements offered to employees linked a portion of the employees' compensation to Wit's prospects for success. Under his stock option agreement, Boyce was given the option to purchase 800,000 shares of Wit stock at an exercise price of $1.00 per share. The exercise period for the option was ten years, except that, if terminated, Boyce had one year within which to exercise. In addition to other terms of employment, Boyce and Klein memorialized Boyce's stock option in a memorandum entitled "Working with WIT Capital"; the memo was signed and dated February 20, 1997, by both Boyce and Klein. Relevant to the discussion here, the fourth paragraph of

---

1. Wit Capital Group, Inc. is a predecessor to Soundview Technology Group, Inc. For convenience, we will refer to the Defendant–Appellee as either "Wit" or "the Company."

the memo outlined the terms of Boyce's stock option. Continuing, the tenth paragraph of the memo, entitled "Termination," stated, *inter alia:* "The stock option grant (need draft copy of Incentive Stock Option Agreement) may be exercised within one year if my employment services and/or consulting relationship with the Company terminates completely."

After he made several requests, in early October 1997, Boyce finally received two copies of the Incentive Stock Option Agreement ("ISOA"). Significantly, the terms of the termination provision under the ISOA were markedly different than those previously agreed upon by Klein; the new provision read, *inter alia:*

> 8. *Termination of Services.* (a) In the event that (i) the Company or any subsidiary or parent thereof terminates your services with such entity "for cause" or (ii) you terminate your services with such entity for any reason whatsoever (other than as a result of your death or "disability" (within the meaning of Section 22(e)(3) of the Code)), the Option may only be exercised within one month after such termination, and only to the same extent that you were entitled to exercise the Option on the date your services [sic] was so terminated and had not previously done so.

Despite directions to sign and return the ISOA, Boyce never did so.[2]

In May 1998, Boyce's employment with Wit was terminated. He did not exercise his stock option at that time.

### B. Wit's Initial Public Offering

Thereafter, Wit engaged in a series of private placements:[3] between September 17, 1998, and November 19, 1998, Wit sold almost 6 million shares of series C stock at $1.00 per share to a small group of individual and institutional investors; between November 19, 1998, and March 8, 1999, Wit sold over 21 million shares of series D stock at $1.50 per share to both individual and institutional investors; and on March 26, 1999, Wit sold over 16.6 million shares of series E stock at $1.50 per share to The Goldman Sachs Group. Toward the end of its selling period of the series D stock, on February 11, 1999, Wit's board of directors agreed to seek public financing. On March 12, 1999, Wit issued a press release stating its intention to launch an initial public offering ("IPO") that it hoped to complete during the second quarter of the year; there was no indication regarding the amount of money Wit sought to raise nor any indication of the price at which Wit anticipated its stock to be offered.

On March 18, 1999, Wit filed a Form S–1 Registration Statement ("S–1") with the Securities and Exchange Commission ("SEC").[4] Between its March 12th press

2. Ultimately, the jury found Boyce and Klein's "Working with WIT Capital" memorandum controlling regarding the option's exercise period in the event of termination, *i.e.,* Boyce had one year from his termination within which to exercise his option.

3. "private placement" is the "sale of stocks, bonds, or other investments directly to an institutional investor like an insurance company." John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 440 (Barron's Financial Guides, 4th ed.1995); *see also* Stephen C. Blowers, Peter

H. Griffith & Thomas L. Milan, *The Ernst & Young LLP Guide to the IPO Value Journey* 280 (John Wiley & Sons, Inc.1999) (defining a private placement as the "[s]ales of securities not involving a public offering and exempt from registration pursuant to certain exemptions.")

4. Generally speaking, a registration statement is a "document detailing the purpose of a proposed public offering of securities. The statement outlines financial details, a history of the company's operations and management, and other facts of importance to poten-

release and its March 18th SEC filing, Wit's board of directors met several times to discuss various aspects of the IPO, such as the amount of money to be raised, the valuation of the company, and the choice of an underwriter of the IPO. Despite these meetings, though, Wit's March 18th S-1 did not include a per share public offering price or the number of shares to be offered through the IPO. It did, however, indicate a "proposed maximum aggregate offering price" of $80 million, with this figure supposedly being employed to estimate the registration fee. The Company's board of directors also met on April 1, 1999, at which time it resolved to sell up to 8,740,-000 shares of common stock in its IPO. Minutes from the April 1st board meeting also evidence, "[t]he Board discussed the potential pricing range and pricing of shares in the IPO," and establish "[i]t was determined to adopt and appoint a Pricing Committee of the Board to assist in negotiating and approve the final pricing terms of the IPO with the managing underwriters."

Given the flurry of IPO-related activities and "the fact that the company . . . had investors that were putting money into the company and were going to take the company public, and the fact that the stock was going to be worth a lot more when it went public," Boyce decided to exercise his option to buy 800,000 shares of Wit stock at the $1.00 per share strike price. Thus, on March 31, 1999, Boyce sent the Company an $800,000 check together with an

option exercise form. On April 5, 1999, Wit rejected Boyce's check and exercise form, informing Boyce that his attempted exercise was untimely as he had not exercised the option within 30 days of his termination.

Wit successfully brought the Company public on June 4, 1999; the Company sold 7.4 million shares of stock at $8.37 per share, raising $80 million. Wit's stock closed at $14.875 per share on its first day of public trading.

## C. The Law Suit and Trial

On March 27, 2003, Boyce filed suit against Wit, alleging it was liable for breach of contract resulting from its April 5, 1999, refusal to allow Boyce to exercise his option. A focal point of the lawsuit became the value of Wit's stock. Significantly, both before and during the trial, Boyce sought to introduce evidence regarding the Company's stock valuation that was dated after April 5, 1999. For example, Boyce sought to introduce Wit's second amended S-1 filed with the SEC on May 4, 1999 (hereinafter, the "amended S-1"); documents showing the price of Wit's stock the day of its IPO, June 4, 1999; documents showing the range of prices at which Wit's common stock was publicly traded in 2003; expert testimony from an appraisal specialist who concentrated in the valuation of corporations, and who, at a hearing,[5] testified that, in making his valu-

tial buyers." Downes & Goodman, *supra* note 3, at 470. More specifically, it is a "disclosure document filed with the SEC pursuant to the registration requirements of federal securities laws . . . [that] includes the *prospectus and other information required by* the SEC." Blowers, et al., *supra* note 3, at 281. And, the Form S-1 is the most comprehensive of the various types of registration statements required of issuers that "are not

eligible to use any of the abbreviated registration forms." *Id.* at 277.

5. There was some discussion between Boyce's counsel and the district court judge whether the hearing was a more narrow one under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (providing a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony) or a somewhat broader inquiry under *Kumho Tire Co.*

ation, he considered the IPO offering price[6] as a "very good measure as to the market's perception of the fair value of the stock." Wit filed several motions *in limine*, seeking the exclusion of post-April 5, 1999, evidence. Ruling on the motions, the district court decided that, although it would allow evidence showing what "knowledgeable investors anticipated the future conditions and performance [of the company] would be at the time of the breach," it would not allow in any evidence related to events after April 5, 1999. The district court indicated it would take a "restrictive" view of Boyce's valuation expert; Boyce then expressed an intention to call his expert for rebuttal purposes, not as a principal witness.

In his case-in-chief, Boyce testified in his own behalf. He also called Lloyd Feller, Wit's senior vice president and co-general counsel; Feller testified, *inter alia*, that when he joined Wit in March 1999, he knew the Company was contemplating an IPO. Feller also testified that, as part of his compensation package, he was given stock options for which the Company gave him a loan so he could exercise those options. Boyce's counsel questioned Feller about the $80 million figure contained in the Company's preliminary S-1 filing, its amended S-1 filing, and in the final prospectus. Feller testified that the figure was a placeholder that eventually turned out to be the amount of money the Company raised.

When Boyce sought to introduce the Company's amended S-1 into evidence, the defendant objected and the objection was sustained. The district court refused admission of the amended S-1 because it was dated after April 5, 1999, despite containing financial information from before that date. In fact, when Boyce requested the admission of only the first page of the amended S-1 identified as rebuttal evidence, the judge characterized the $80 million figure as a "wishfulness number." The judge also limited Boyce's examination of Feller to Feller's pre-April 5th knowledge of the amount of money Wit sought to raise in its IPO. With his examination of Feller thus stymied, Boyce rested.

Wit first called its founder, Andrew Klein. On cross-examination, Klein maintained he did not know how much money Wit intended to raise through its IPO. While Boyce sought to solicit from Klein whether the alleged $80 million figure remained consistent in later filings with the SEC, the judge's evidentiary ruling precluded Boyce from securing any answers from Klein on this issue.

Next, Wit called Ronald Readmond, both a director and chairman of Wit, as well as its then-president and chief operating officer. Readmond offered detailed testimonial evidence (together with summary charts) of the Company's stock sales from its treasury. Despite this knowledge, Readmond testified that he did not inform the underwriters about how much money the Company sought to raise and, like Klein, he did not know the amount to be raised by Wit's IPO until May 1999—after Wit's April 5th breach with Boyce. As with Klein, during cross-examination,

*Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court's key decision interpreting Federal Rule of Evidence 702. The district court judge considered it the latter. *See* JA 67 ("THE COURT: *Kumho* is a different prospect so it's going to include everything, unfortunately, or fortunately, as the case may be.").

6. The "offering price" is "[t]he price at which the IPO is first sold to the public. It is set by the lead underwriter, usually after the close of stock market trading the night before the shares are distributed to IPO buyers." Blowers, et al., *supra* note 3, at 280.

Boyce attempted to pursue a line of questioning about the $80 million figure used in all the Company's S–1 filings with the SEC. Again, the district court forestalled such questioning; the judge allowed only the asking of "the single question, did this number [the $80 million] or the number on the March 18 S–1, in a sort of casual way, continue to be approximately the same amount." Trial Tr. (Readmond—cross) at 570, *Boyce v. Soundview Tech. Group, Inc.,* No. 03 Civ. 2159(HB), 2004 WL 3543365 (S.D.N.Y.2004). In response to this questioning, Readmond testified that he did not remember.

Finally, Wit presented its expert, Dr. Ma, to introduce evidence of the stock's fair market value on April 5, 1999. Unsurprisingly, Ma's testimony was consistent with the Company's position that the value of the stock at the time of the breach was $1.50. Ma based her stock valuation on the Company's private placement sales—which were also block sales—just prior to April 5th and just to three institutional investors: Capital Z, Draper Fisher Jurvetson, and Goldman Sachs. *See id.* at 632 (Ma—cross).

Before the parties' closing arguments, the district court judge made an evidentiary ruling regarding the admission of the first page of another amended S–1, dated June 3, 1999. Boyce had sought its introduction to show that the $80 million figure included in the preliminary S–1 was not really a "filler" number, but, rather, was the actual amount of money Wit intended to raise through its IPO; thus, admission of this document was to challenge the credibility of both Klein and Readmond who testified they did not know how much money the Company sought to raise. The Court denied its admission, ruling Boyce could accomplish this end without the first page of the June 3rd amended S–1. In his ruling, the judge emphasized: *"This argu-*

*ment may only be used as a credibility argument."* Memorandum from Harold Baer, Jr., District Judge, United States District Court, Southern District of New York, to Counselors [Barry I. Fredericks and Nathan Z. Dershowitz, for Plaintiff; Kevin T. Rover and Leza Maria De Bella, for Defendant] (July 21, 2004) ("Re: *Boyce v. Soundview,* 03 Civ. 2159—Admission of Cover Pages to Amendments 1–3").

Prior to charging the jury, the parties submitted proposed jury instructions for the court's consideration. Among the instructions Boyce sought to have included was the following:

> The amount of recoverable damages is a question of fact, and the measure of damages upon which the factual computation is based is a question of law. Under a breach of contract theory, damages should be calculated on the date of the breach. Using the date of the breach takes expected loss profits into account. The measure of damages is based on what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach. If the amount of damages is uncertain, the burden of uncertainty falls on the wrongdoer.

Pl.'s Proposed Supplemental Jury Instruction No. 37, *Boyce v. Soundview Tech. Group, Inc.,* No. 03 Civ. 2159(HB), 2004 WL 3543365 (S.D.N.Y.2004). Boyce refers to this as the "knowledgeable investor" instruction and the instruction on the "wrongdoer rule." However, the district court instructed the jury as follows:

> The amount of recoverable damages is a question of fact—that is you [*i.e.,* the jury]. And the measure of damages upon which the factual computation is based is a question of law—that is me [*i.e.,* the court]. Under a breach of contract theory, damages should be calculated on the date of the breach. Using

the date of the breach takes expected lost future profits into account. In summation, you heard reference by plaintiff to a rule of law denominated wrongdoer. Since I may have misunderstood the reference, I just want to be sure we are all on the same page. It is a phrase that has come to be disliked. In any event, let me clarify it and indeed it may not be exactly what you heard. First[,] this wrongdoer rule is a rule as to alleged the burden of proof and it has to do with a shifting of the burden of proof to the defendant on the issue of damages. And the rule states that the alleged wrongdoer, the defendant, most frequently the defendant, may not object to the plaintiff's reasonable estimate of the amount of damages when it is supported by evidence because that estimate was not based on more accurate data which the law goes on to say must be shown to say as a consequence of the wrongdoer's misconduct making that additional evidence unavailable. So for this rule to be applicable and the burden to prove damages to shift to the defendant, you must find both the plaintiff offered a reasonable estimate in the amount of plaintiff's damages and to defendant's wrongdoer is to blame for plaintiff's inability to offer more precise evidence.

Trial Tr. at 841–42. Also relevant here is the court's instruction on the fair market value of stock:

Fair market value of an asset such as stock is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. You have heard a lot of testimony and argument on this issue, including Dr. Ma's opinion. Keep in mind that generally the sale price for the same asset, sold close in time to the asset being valued (here, April 5, 1999),

if it is the result of arm's length negotiations, is the best evidence of the asset fair market value.

*Id.* at 841. The district court judge did not instruct the jury on a "knowledgeable investor" as requested by Boyce.

After deliberating, the jury found Wit did breach its stock option contract with Boyce and determined Boyce was entitled to $400,000 in damages.

### D. Post–Trial

Unsatisfied with some of the district court's evidentiary rulings and some of its jury instructions, and pursuant to Federal Rules of Civil Procedure 59, Boyce moved for a new trial. The district court denied Boyce's motion. In its opinion, the district court addressed and rejected Boyce's three main arguments: (1) that the court precluded Boyce's "forward looking" evidence and improperly charged the jury regarding damages; (2) that the court's "wrongdoer rule" jury instruction was legally incorrect; and (3) that the court improperly excluded evidence dated after April 5, 1999. *Boyce v. Soundview Tech. Group, Inc.,* 2004 WL 2334081, at *1 (S.D.N.Y. Oct.14, 2004). Boyce makes the same arguments on appeal.

## II. *Discussion*

■■■ It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach. *See Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 262–63 (2d Cir.2002); *Hermanowski v. Acton Corp.,* 580 F.Supp. 140, 145 (E.D.N.Y.1983), *aff'd in relevant part,* 729 F.2d 921 (2d Cir.1984) (per curiam). The same is true of the concept that "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar*

*Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 196 (2d Cir.2003). Moreover, there is no argument that, here, "the measure of damages is the difference between the option price and the market value of the stock ...." *Hermanowski,* 580 F.Supp. at 146.

All parties agree that the damages to which Boyce is entitled are to be measured as of April 5, 1999. The main argument here is over how to value the Company's stock on April 5th, as this is the basis for determining damages. If we were dealing with a publicly traded stock, that determination would be straightforward: we would use "the mean between the highest and lowest quoted selling prices," *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973), as provided by the public exchange upon which the stock traded. Here, though, at the time of Wit's breach, the Company's stocks were not publicly traded, although they were on their way to being so. Thus, valuing the Company's stock is not as straightforward.

Boyce's objection to the jury's determination of damages stems from some of the district court's evidentiary rulings and some of its jury instruction rulings. Boyce believes the district court erroneously excluded relevant evidence about the value of the stocks that would have helped the jury make its damages determination. Similarly, Boyce argues that the district court erred in excluding one requested jury instruction and in misinforming the jury on another instruction; these jury instruction errors also affected the jury's calculation of damages. In sum, Boyce contends that the district court's evidentiary and jury instruction errors warrant a new trial.

We turn first to the evidentiary rulings and then to the jury instructions.

**A. Evidentiary Rulings**

 When a district court's evidentiary ruling is challenged on appeal, this Court reviews the ruling under an abuse-of-discretion standard. *See Zurich Am. Ins. Co. v. ABM Indus., Inc.,* 397 F.3d 158, 171–72 (2d Cir.2005); *Silverstein v. Chase,* 260 F.3d 142, 145 (2d Cir.2001); *In re Martin–Trigona,* 760 F.2d 1334, 1344 (2d Cir.1985) (evidentiary rulings generally not to be disturbed unless " 'manifestly erroneous' ") (quoting *Salem v. U.S. Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). "Either an error of law or a clear error of fact may constitute an abuse of discretion." *Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218, 224 (2d Cir.1999) (quoting *Charette v. Town of Oyster Bay,* 159 F.3d 749, 755 (2d Cir.1998) (further citation omitted)).

> An evidentiary ruling that is an abuse of discretion is, however, only reversible if it also affects a party's substantial rights. *See* Fed.R.Evid. 103(a). This occurs when, for example, a district court excludes a party's primary evidence in support of a material fact, and failure to prove that fact defeats the party's claim. *See O'Neal v. Esty,* 637 F.2d 846, 848 (2d Cir.1980).

*Id.*

Here, Boyce has challenged two of the district court's evidentiary rulings, claiming those rulings constitute reversible error: the alleged exclusion of Boyce's expert's testimony and the exclusion of post-April 5th evidence. We will examine each in turn.

**1. Exclusion of Boyce's Expert Witness**

 Boyce claims that the district court erroneously precluded his expert, Mr. Antoon, from testifying. This is a mischaracterization of the judge's ruling. While, at the *Kumho Tire* hearing, the

judge indicated he would take a restrictive view of Antoon's testimony since much of Antoon's opinion was based on post-April 5th data, the record demonstrates that the judge did not preclude Antoon from testifying. Moreover, Boyce's counsel informed the court that he would call Antoon as "a rebuttal witness, not as our principal witness." The fact that—for whatever reason—Boyce decided not to call Antoon is not an error that can be attributed to the judge. In any event, it is within the party's discretion whether to call a proffered expert as a rebuttal witness. *See generally Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (admonishing courts from second guessing counsel's chosen trial tactics); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 611.02[2][a] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 1997) ("In the usual case, the order and mode of the presentation of evidence and interrogation of witnesses are determined by well-recognized legal conventions and the parties' choice of trial tactics."); *see also Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir.2005) (instructing that where a party does not contemporaneously object to an evidentiary ruling, that party must demonstrate "plain error" that is "serious and flagrant," challenging the "very integrity of the trial" (citation omitted)). Thus, we will not assign error to the district court for a discretionary decision made by Boyce's counsel in not calling its expert witness.

### 2. Exclusion of Post–April 5th Evidence

■ Relying on *Lucente* and *Oscar Gruss*, the district court "drew a bright line, excluding all evidence of the value of the stock *dated* after April 5, 1999, because, as the Second Circuit unequivocally stated, 'New York courts have rejected awards based on what the actual economic conditions and performance were in light of hindsight.' " *Boyce*, 2004 WL 2334081, at *2 (quoting *Oscar Gruss*, 337 F.3d at 196) (emphasis added). In drawing its line, though, the court made too broad a stroke. By attempting to exclude evidence based on hindsight, the district court also excluded admissible evidence tending to show economic conditions and performance during the relevant time period.

The district judge's April 5th "bright-line" ruling was too mechanical and, ultimately, deprived Boyce of the full benefit of his bargain. This is problematic as the primary purpose of damages is to put a wronged party in as good a position as if the breach did not occur. *See Oscar Gruss*, 337 F.3d at 196; *Lucente*, 310 F.3d at 262.

The clearest example of the overreach of the "bright line" ruling is the court's exclusion of the amended S–1: although dated May 4, 1999, the amended S–1 contained Wit's first quarter financial statements,[7] prepared as of March 31, 1999. Thus, at a minimum, the jury was precluded from

---

7. A financial statement is the

written record of the financial status of an individual, association, or business organization. The financial statement includes a balance sheet and an income statement (or operating statement or profit and loss statement) and may also include a statement of cash flows, a statement of changes in retained earnings, and other analyses.

Downes & Goodman, *supra* note 3, at 190. *See also* George Thomas Friedlob, Ph.D., and Ralph E. Welton, Ph.D., *Keys to Reading an Annual Report* 7 (Barron's Business Keys, 2d ed.1995) (instructing that the "heart" of an annual report is its financial statements and that "[t]he minimum report consists of a balance sheet, income statement, statement of cash flows, and the accompanying notes and auditor's opinion.").

considering Wit's balance sheet and income statement—permissible forward-looking evidence that would aid a knowledgeable investor in anticipating the future conditions of the Company and in valuing Wit's stock on April 5th. Because the Company was in the midst of going public, requiring it to (a) compile and finalize its financial statements for inclusion in its prospectus, (b) determine how much money was feasible to raise, and (c) decide the initial offer price of its stock, the financial information contained in the May 4, 1999, amended S-1 was highly relevant and material to Boyce's case. We disagree with the district judge's conclusion that the amended S-1 was speculative or wishful thinking. In our view, the May 4th S-1 contained primary evidence that the fact finder could have utilized in determining the Company's stock value. The exclusion of the amended S-1s defeated Boyce's efforts to prove the fair market value of the Company's stock at the time of Wit's breach.

■ While it is true that an arm's length transaction—the so-called "willing buyer-willing seller" test—is the best evidence of (and often the easiest method to determine) fair market value, it is, by no means, the only such evidence. Indeed, determining value is a factual inquiry. *See Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir.1990); *Silverman v. Comm'r*, 538 F.2d 927, 933 (2d Cir.1976) (discussing valuation for gift tax purposes). That is precisely why we noted that a valuation determination "is one that is entitled to be made on all the elements of the particular case. Valuation is ... necessarily an approximation." *Silverman*, 538 F.2d at 927 (citations omitted; emphasis added; ellipses in original); *see also Eisenberg v. Comm'r*, 155 F.3d 50, 53 (2d Cir.1998) (noting that for closely held corporations for which there is no public trading market, valuation of stock is based on a variety of factors). This concept is not limited only to tax matters. In fact, recently, in a criminal setting, this Court has noted that, while we generally rely on fair market value as a measure of property value, in certain "circumstances other measures of value may more accurately" serve the purpose for which valuation is required. *United States v. Boccagna*, 450 F.3d 107, 116 (2d Cir.2006); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (discussing use of foreclosure price as measure of value in bankruptcy proceeding); *United States v. Simmonds*, 235 F.3d 826, 832 (3d Cir.2000) (using replacement value rather than fair market value in calculating restitution); *cf. Sarrouf v. New England Patriots Football Club, Inc.*, 397 Mass. 542, 492 N.E.2d 1122, 1127–28 (1986) (affirming trial judge's denial of consideration of market value as reliable indicator of value where stock not regularly traded on a recognized exchange and there was no established market for asset); *Pollen v. Aware, Inc.*, 53 Mass.App.Ct. 823, 762 N.E.2d 900, 905 (2002) (upholding trial judge's use of offering price in IPO as best indicator of stock's fair market value where breach of stock option occurred two months before IPO); *Kaminsky v. Segura*, 4 Misc.3d 1019, 798 N.Y.S.2d 345, No. 119675/03, 2004 WL 1945007, at *5 n. 4 (N.Y.Sup.Ct. July 6, 2004)(noting that "in certain limited circumstances, where a rigid application of [the general rule that the loss sustained is measured at the time of breach] would lead to an inequitable result or deny plaintiff of the benefit of the bargain, the pertinent measuring period may be extended to a reasonable period of time after the time of breach" (internal quotes omitted; further citation omitted)).

Here, considering the Company's imminent entrance into the public market at the

time of its breach to Boyce, in conjunction with case law suggesting that the willing buyer-willing seller test is not the exclusive method for determining value, we find the *Silverman* case instructive. We, therefore, digress for a moment to further discuss it.

In *Silverman,* the Commissioner had issued deficiency notices to taxpayers who had gifted some of their stock in a company for which they were principals. *See Silverman,* 538 F.2d at 928. The taxpayers, as principals, were planning to bring the company public. In anticipation of this transformation, the taxpayers initially instituted a plan of reorganization, which required, *inter alia,* increasing the number of issued shares and creating new classes of stock. *See id.* at 929. Shortly thereafter, the taxpayers gifted shares of stock to various trusts benefitting their respective children. *See id.* The Commissioner issued deficiency notices to the taxpayers based on undervaluation of the gifted shares. The taxpayers challenged the Commissioner's valuation in tax court. *See id.* at 930. After the tax court upheld the Commissioner's valuation, the taxpayers then appealed to this Court. *See id.*

While noting that an arm's length sale of stock is the best evidence of value, *see id.* at 931 n. 7, this Court also noted that at the time of the transfer of the stock to the trusts, there was no public market for that stock. *See id.* Significantly, the Court emphasized that the pre-IPO sales of company stock to employees and counsel of the company "lacked the elements of arm's length transactions and therefore [the tax court was correct to] not rely on these sales in reaching its determination of value." *Id.* Importantly, the *Silverman* Court observed that when determining a stock's fair market value, one must consid-

er the viewpoint of both the buyer and the seller: "The opinion [of fair market value] must represent not only the seller's viewpoint, but also the buyer's, since value in the market place reflects both influences." *Id.* at 932 n. 8 (citation omitted); *cf. Schonfeld v. Hilliard,* 218 F.3d 164, 181 (2d Cir.2000) ("The value placed on an asset by a purchaser, however, does not become evidence of the asset's market value unless it is also the price at which a reasonably informed seller is willing to sell the asset."). Ultimately, the tax court did not determine the company's stock value using the arm's length transaction approach. Rather, it used "a price to average earnings multiple of 10 which had been suggested by the [taxpayers'] own expert witnesses." *Id.* at 932. This Court found no error with the tax court's method of valuation. *See id.* at 932–33. Relying on *Anderson v. Comm'r,* the Court stated: " 'It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence.' " *Id.* at 933 (quoting *Anderson v. Comm'r,* 250 F.2d 242, 249 (5th Cir.1957), *cert. denied,* 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958)).

■ Despite the fact that *Silverman* is a tax case and this one is not, we believe the facts of *Silverman* are significantly analogous to this case, such that the reasoning of the *Silverman* Court is helpful here. Most germane is that, like *Silverman* (and unlike *Oscar Gruss* and *Lucente* ), we are presented with a case involving determining the value of stock of a private company in the process of going public. Acknowledging that fair market value is normally determined on the basis of an arm's length transaction,[8] the *Silver-*

---

8. Indeed, the Supreme Court's endorsement of the "arm's length transaction" test as the

*man* Court also recognized that certain sales lack the elements of an arm's length transaction, making reliance on such sales questionable. We believe this observation is paramount to Boyce's case because the pre-breach stock sales by Wit, upon which the Company relies to establish its stock's fair market value, were primarily to institutional investors and employees. In fact, Wit's expert, Dr. Ma, testified that her valuation of the Company's stock was based on pre-IPO block sales to three institutional investors. Similar to the *Silverman* stock sales (*i.e.*, pre-IPO sales to company insiders that were not viewed as arm's length), we believe the judge should have considered the nature of Wit's pre-IPO, pre-breach stock sales to employees and institutional investors in weighing the evidentiary relevance of these sales for establishing the stock's fair market value.

Moreover, regarding the amended S–1s that contained the Company's financial statements that Boyce sought to admit, we are unpersuaded by the Company's present argument that the district court was correct in excluding the amended S–1s because "the statements reflected pro forma financials" and the Company did not approve the financial statements until April 23, 1999, after the April 5th breach. Def.'s Br. at 55. First, the Company was obligated to prepare truthful and accurate financials; their pro forma nature is irrelevant. Second, the post-breach approval of the statements is also irrelevant; what is relevant here is that the information in the statements concerned the Company's financial picture pre-breach, and therefore

compromise clearly permissible forward-looking evidence. Moreover, had the amended S–1s been admitted, the Company would have been free to challenge the finality of the information contained therein.

We are mindful that the district court must walk a delicate balance in allowing the jury to consider only evidence in foresight, and not hindsight. This, however, does not justify the district court judge's imposition of April 5th as a cut-off date for consideration of value evidence. The jury should have been able to make its valuation determination on all relevant elements of the case, whether dated pre-April 5th, April 5th, or, perhaps, some short time period thereafter. Our precedent supports the conclusion that consideration of evidence dated post-April 5th can properly be considered by the fact finder in making this determination without violating the rule against considering evidence in hindsight. However, because the judge abided by his April 5th "bright line" rule without weighing other factors of the case and determining their aggregate significance, we believe Boyce's substantial rights were affected. Thus, Boyce is entitled to a new trial on damages.

## B. Jury Instructions

Within this Circuit, the law is settled that "[a] litigant is entitled to have the jury instructed as to his claims and theories of law if supported by the evidence and brought to the attention of the court." *See Carvel Corp. v. Diversified*

---

best evidence of fair market value evolved from a tax case. *See United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (quoting Treas. Reg. § 20.2031–1(b)). Similarly, this Court relied upon a Revenue Ruling in a tax case valuing non-publicly traded stock when it stated: "For closely held corporations ... for which there is no public trading market, valuation of stock

is based on a variety of factors." *Eisenberg v. Comm'r*, 155 F.3d 50, 53 (2d Cir.1998) (referencing Revenue Ruling 59–60 that states, *inter alia*, "A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness *must* enter into the process of weighing those facts and determining their aggregate significance." (Emphasis added)).

*Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991). Yet, "a trial court has discretion in the style and wording of jury instructions so long as the instructions, taken as a whole, do not mislead the jury as to the proper legal standard, or adequately inform the jury of the law." *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106–07 (2d Cir.2001) (internal citations and quotations omitted).

 When a party challenges a court's jury charge, this Court reviews the jury instructions *de novo* and as a whole. *See LNC Invs., Inc. v. First Fidelity Bank, N.A.*, 173 F.3d 454, 460 (2d Cir. 1999); *Luciano v. Olsten Corp.*, 110 F.3d 210, 218 (2d Cir.1997). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *LNC Invs.*, 173 F.3d at 460 (quoting *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994)); *see also Luciano*, 110 F.3d at 218. "An erroneous instruction requires a new trial unless the error is harmless." *LNC Invs.*, 173 F.3d at 460 (quoting *United States v. Masotto*, 73 F.3d 1233, 1238 (2d Cir.1996)); *see also Luciano*, 110 F.3d at 218 (instructing that a new trial will not be granted "unless, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law" (internal citations and quotations omitted)). An erroneous jury instruction is harmless if it is clear that it did not influence the jury's verdict. *See LNC Invs.*, 173 F.3d at 462 (quoting *Masotto*, 73 F.3d at 1239).

Here, Boyce claims that the district court erred in refusing to charge the jury with the "knowledgeable investor" instruction requested by him, thus requiring reversal. He also contends that the court committed reversible error in misinforming the jury on the "wrongdoer rule," an instruction Boyce sought. For the reasons stated below, the Court, concludes that the district court indeed, committed reversible error in both instances.

### 1. The "Knowledgeable Investor Jury" Instruction

 At the time of Wit's breach on April 5, 1999—a time during which Wit was preparing to go public, as evidenced by the Company's March 1999 press release announcing those plans—it was not unreasonable for Boyce, as a knowledgeable investor, to anticipate that the value of Wit's stock was higher than the $1.00 per share exercise price of his stock option or higher than the $1.50 per share price at which Wit was selling its stock in private placements and block sales to large institutional investors. We believe there was sufficient evidence, despite the court's "bright line" approach to evidentiary admissions, to support Boyce's theory that knowledgeable investors anticipated the future conditions and performance of the stock to be greater than the pre-breach, block sale, $1.50 per share price. Indeed, as Wit founder Klein testified, the reason institutional investors invested early in the Company was because the stock would "be worth a lot more money than the price that they paid to be shareholders." (He similarly testified that offering stock to early employees was used as an incentive to induce these people to join Wit when it was a start-up company.)

The IPO process compelled the Company to comply with the filing requirements of the SEC, which are quite stringent; a company is required to make full financial disclosure in order to secure approval for the issuance of its stock. *See generally* Blowers, et al., *supra* note 3, at 141–44 (providing an overview of the SEC registration process). Much of that information was found in the Company's S–1s, and the

fact finder, therefore, ought to be able to consider this evidence.

At the time of its breach, the information about Wit's initial public offering converged with what Boyce anticipated the future conditions and performance of Wit would be. Even accepting that Wit's IPO plans were not a guarantee of the Company's performance in the initial offerings market, information gathered in anticipation of the IPO and contained in the amended S–1s was relevant to show what a knowledgeable investor anticipated the future conditions and performance of Wit's stock would be at the time of its breach.[9]

▮ Relying upon *Sharma v. Skaarup Ship Management Corporation*, 916 F.2d 820 (2d Cir.1990), Boyce included the "knowledgeable investor" instruction in his proposed jury charge submitted to the court for its consideration. He also requested this instruction in the jury charge conference. Upon review of the record before us, as well as of this Court's law, we conclude that Boyce was entitled to have the jury instructed with the "knowledgeable investor" instruction: A damages award should be based upon what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach. *See Sharma*, 916 F.2d at 826. Since it is not clear how this omission influenced the jury's damages award, we conclude the omission was reversible error.

**2. The "Wrongdoer Rule" Jury Instruction**

▮ Where a party breaches a contract, that party is liable to the non-breaching party for damages and the amount of damages must put the non-breaching party in as a good a position as if the breach had not occurred. *See Oscar Gruss*, 337 F.3d at 196 ("damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract"). Thus, a non-breaching party "is entitled, as a matter of law, to recover market value damages *to the extent* that they can be proven with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 182 (2d Cir.2000). We have also instructed that where " 'the existence of damage is certain, and the only uncertainty is as to its amount, ... the burden of uncertainty as to the amount of damage is upon the wrongdoer.' " *Id.* (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir.1977)). Further, in *Contemporary Mission*, this Court instructed that "the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount. The plaintiff need only show a 'stable foundation for a reasonable estimate,' " of damages to which he is entitled as a result of the breach. 557 F.2d at 926 (quoting *Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 383, 357 N.Y.S.2d 857, 861, 314 N.E.2d 419 (1974) (internal citation omitted)). Relatedly, the *Contemporary Mission* Court also reiterated that "[e]vidence need not be conclusive in order to be relevant." *Id.* at 927. Indeed, more recently we noted that "when reviewing the sufficiency of the damages evidence, we are guided by the principle that if a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty."

---

9. We are confident that, on remand, the district court will be able to instruct the jury on the proper consideration to be given to evidence that might, at first blush, be considered "hindsight" evidence; we are equally confident that the jury will follow those instructions.

*Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 496 (2d Cir.1995) (citing *W.L. Hailey & Co. v. County of Niagara,* 388 F.2d 746, 753 (2d Cir.1967) (collecting New York cases)). Reaffirming the key concept that damages are meant to put a plaintiff in the same economic position he would otherwise be in but for a defendant's breach of contract, the *Indu Craft* Court stated, "A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain." *Id.* (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N.Y. 205, 209, 4 N.E. 264 (1886)). Thus, "[t]he wrongdoer must shoulder the burden of the uncertainty regarding the amount of damages." *Id.* (citing *Contemporary Mission,* 557 F.2d at 926).

■■■ Given this landscape of case law, we must conclude that, here, the district court's instruction to the jury on the "wrongdoer rule" was erroneous. First, the district court's characterization of the "wrongdoer rule" as "disliked" improperly framed the rule in a negative light. Having reviewed the "wrongdoer rule" instruction the district court judge delivered, we are concerned that the judge's "disliked" characterization implicitly discouraged the jury's application of it. Further, since it is not clear that this negative characterization of the rule did not give a misleading impression of the law and, in turn, did not influence the jury's damages award, we will not conclude that it was harmless.

■■■ Second, we find the "wrongdoer rule" instruction delivered in this case confused the law; the court instructed the jury that the rule requires a shifting of burden from the plaintiff to defendant when no such shift is required. Simply put, it is always the breaching party (read: "wrongdoer") who must shoulder the burden of the uncertainty regarding the

amount of damages. *See id.* All a plaintiff must establish is (1) that the defendant caused the breach and (2) that damages resulted from that breach. Our case law is clear that a plaintiff need only demonstrate a " 'stable foundation for a reasonable estimate,' " as to damages. *Contemporary Mission,* 557 F.2d at 926. Boyce made his prerequisite showing that Wit breached its contract with him and, as a result, he is entitled to damages. The district court should not have required more of Boyce. Since the court's confused "wrongdoer rule" instruction provided the jury with an inadequate understanding of the law, we conclude that a new trial must be granted.

### III. *Conclusion*

The damages judgment of the district court is VACATED and the case is REMANDED for a new trial on damages consistent with this opinion.