**In re Ignacio HERNANDEZ and Julia Hernandez, Debtors.**

**Ignacio Hernandez and Julia Hernandez, Plaintiffs**

**v.**

**TCF Banking & Savings, Defendant.**

**Bankruptcy No. 12 B 14383.**
**Adversary No. 12 A 00748.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 10, 2013.

Trustee has heard nothing from the taxing authority?"), *supp. op.*, No. 11–59449, 2013 WL 780757 (Bankr.E.D. Mich. Mar. 01, 2013).

Jonathan D. Parker, Geraci Law L.L.C., Chicago, IL, for Plaintiffs.

Christine M. Fallara, Matteo A. Crawford, David T. Cohen & Associates, Ltd., Orland Park, IL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Ignacio Hernandez and Julia Hernandez ("Plaintiffs") filed this Adversary Complaint pursuant to 11 U.S.C. §§ 506(a), (d) and Fed. R. Bankr.P. 3012 to determine

the nature and extent of liens held by TCF Bank ("Defendant") and secured by Plaintiffs' residence. It relates to their chapter 13 bankruptcy case. Following trial, the following Findings of Fact and Conclusions of Law are made and entered.

## FINDINGS OF FACT

1. Plaintiffs filed a voluntary petition for relief under Chapter 13 of Title 11 of the United States Code on April 9, 2012 (the "Petition Date").

2. Plaintiffs are joint owners of a parcel of real estate commonly known as 4447 S. Keating Avenue, Chicago, IL 60632 (the "Property").

3. Plaintiffs occupy the Property as their primary residence.

4. The Property is encumbered by three mortgages. Each mortgage is owned by Defendant TCF Bank. Plaintiffs contend that the two junior mortgages are unsupported by equity in the Property and that those mortgages should be found to be unsecured.

5. The first mortgage (hereinafter "First Mortgage") on the Property owned by Defendant is properly recorded in the Office of the Cook County Recorder of Deeds as document number 0412511281. As of the Petition Date, the loan secured by this First Mortgage had a balance of $55,850.91.

6. The second mortgage (hereinafter "Second Mortgage") on the Property owned by Defendant is properly recorded in the Office of the Cook County Recorder of Deeds as document number 0805004069. As of the Petition Date, the loan secured by the Second Mortgage had a balance of $92,698.10.

7. The third mortgage (hereinafter "Third Mortgage") on the Property owned by Defendant is properly recorded in the Office of the Cook County Recorder of Deeds as document number 0805004070. As of the Petition Date, the loan secured by the Third Mortgage had a balance of $5,000.

9. Steven Orlowski is a certified real estate appraiser, licensed by the State of Illinois.

10. Orlowski was hired by Plaintiffs to perform an appraisal of the value of the Property. He personally inspected the Property and valued it at $50,000 as of February 18, 2012. (Pl. Ex. A)

11. James. J. Farrelly is a certified real estate appraiser, licensed by the State of Illinois.

12. Farrelly was hired by Defendant to perform an appraisal of the value of the Property. He personally inspected the Property and valued it at $110,000 as of September 25, 2012. (Def. Ex. A)

13. Both appraisers were qualified as experts in the field of residential home appraisals.

14. For reasons discussed below, the fair market value of the Property is found to have been $110,000 as of the date of the related bankruptcy case was filed.

15. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### *Jurisdiction*

Jurisdiction lies over this proceeding under 28 U.S.C. § 1334(b), and authority over this matter has been referred here by Internal Operating Procedure 15(a) of the District Court for the above-titled District.

This is a proceeding to determine the validity, extent, or priority of a lien and therefore a core matter under 28 U.S.C. § 157(b)(2)(k). Venue is properly placed in this court under 28 U.S.C. § 1409(a).

### Expert Testimony on Value of Property

Each party called an appraiser to testify at trial. The appraisers were each qualified as experts in the field of residential home appraisals and each submitted written appraisals of the Property that reflected their opinion of its value. To estimate the Property's value, both appraisers used the "sales comparison approach." Under that approach, the sales prices of recently marketed and sold homes asserted to be comparable to the Property and in the vicinity of Property were adjusted to reflect the differences between those homes and the Plaintiffs' Property. The adjusted sales prices were then averaged by each expert to estimate the Property's market value.

Using the sales comparison approach, Plaintiffs' appraiser Orlowski estimated the Property's value to be $50,000 as of February 18, 2012. In reaching this conclusion, Orlowski compared the price of three sales of homes that were, in his view, similar in location, size, and condition to Plaintiffs' Property. All three sales were cash sales and each occurred within twelve months of Orlowski's appraisal. Orlowski testified that he inspected the Property's exterior and interior to determine what properties would be comparable. In his opinion, the Property should be compared to other less desirable or inexpensive properties due to the Property's age, lack of basement, and need of a space heater. The Property was not recently updated but needs no major repairs. Orlowski emphasized that he compared Property to others of similar frame construction with aluminum and shingle siding.

Orlowski also described Property as being in a neighborhood with declining home values. Looking at the median sale price over the preceding 12 months, Orlowski found a 14.5% decrease in prices, a decline he described as significant. Orlowski then researched MLS listings for recent sales of properties similar to Property. On cross-examination, Orlowski testified that the declining real estate market was the single most important factor in his valuation. He stated that Property was located in an area where distressed sales and foreclosures were prevalent and bank owned properties abundant. Orlowski testified that there were no properties similar to Property that were not distressed, justifying a lower valuation in his view.

Also using the sales comparison approach, Defendant's appraiser, Farrelly, estimated the Property's value to be $110,000 as of September 25, 2012. In reaching his conclusion, Farrelly also used the sales prices of three properties that he viewed as similar in location, size, and condition to Plaintiffs' Property. Two of the sales used in Farrelly's appraisal were labeled as "arm's length" with the third labeled as a "short" sale. Two others were active listings, meaning no sale has taken place. Farrelly listed several factors he considered of most significance in his report: square footage, bedroom/bathroom count, proximity to the Property, and sales date.

Farrelly's report also identified the market decline, noting that the median sales price decreased 9.7% over the 12 months preceding his analysis. He stated that seller concessions were common in sales and that 36% of sales involved bank owned properties.

Farrelly was also challenged about his choice of comparable properties. In his report, Farrelly used five properties he considered comparable to Property. As

described above, two of the properties were active listings, meaning no sale had taken place. Reflecting the decline in property values, one property that Farrelly used in his report was initially listed for sale at $149,000 but that price was later reduced to $89,000 after remaining on the market for over a year. Another property Farrelly used in his report sold in 2012 for $108,000 but that property had a major upgrade before sale.

### Treatment of Wholly Unsecured Mortgage Claim

Although the Seventh Circuit has not considered the issue, most courts, including the Second, Third, Fifth, Sixth, Ninth, and Eleventh Circuit Courts of Appeals, have permitted the strip off of wholly unsecured junior liens on a Chapter 13 debtor's principal residence. *Pond v. Farm Specialist Realty et al. (In re Pond)*, 252 F.3d 122, 126 (2nd Cir.2001); *McDonald v. Master Fin., Inc. (In re McDonald)*, 205 F.3d 606, 615 (3d Cir.2000), *cert. denied*, 531 U.S. 822, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000); *Bartee v. Tara Colony Homeowners Assoc. et al. (In re Bartee)*, 212 F.3d 277, 295 (5th Cir.2000); *Lane v. Interstate Bancorp (In re Lane)*, 280 F.3d 663 (6th Cir.2002); *Zimmer v. PSB Lending Corp. (In re Zimmer)*, 313 F.3d 1220, 1227 (9th Cir.2002); *Tanner v. FirstPlus Fin. (In re Tanner)*, 217 F.3d 1357, 1359–60 (11th Cir.2000); *Melgoza v. Washington Fed. Bank for Sav. (In re Melgoza)*, 2011 WL 3878361, at *3–4, 2011 Bankr.LEXIS 3257, at *10 (Bankr.N.D.Ill. Aug. 30, 2011). To determine whether a junior lienholder is wholly unsecured, the value of senior claims as well as the value of the underlying collateral must be established. *Pond*, 252 F.3d at 126. The parties have stipulated that Defendant holds a first mortgage on the Property in the amount of $55,850.91. Therefore, if it is found that the Property's value at the time of the hearing is below that amount then Plaintiffs may "strip-off" and void Defendant's junior liens.

Opinions have consistently held that valuation of assets is "not an exact science". *In re Karakas*, No. 06–32961, No. 06–80245, 2007 WL 1307906, at *5, 2007 Bankr.LEXIS 1578, at *6 (Bankr. N.D.N.Y. May 3, 2007); *see also Boyce v. Soundview Tech. Grp.*, 464 F.3d 376, 387 (2d Cir.2006). Rather, "it requires consideration of the purpose of the valuation and all the factual elements of a particular case." *Lepage v. Bank of Am. (In re Lepage)*, Nos. 8–10–74093–reg; 8–10–08287–reg, 2011 WL 1884034, at *4, 2011 Bankr.LEXIS, at *10–11 (Bankr.E.D.N.Y. May 18, 2011) (citing *In re Rash*, 520 U.S. at 961–62, 117 S.Ct. 1879 and *Boyce v. Soundview Tech. Grp.*, 464 F.3d at 387). Valuation "is necessarily an approximation." *Id.* (quoting *Silverman v. Comm'r*, 538 F.2d 927, 933 (2d Cir.1976)). "A judge should look to the accuracy, credibility and methodology employed by the appraisers." *Id.* (citing cases). However, "[a] court is not bound by values determined by appraisals [and] may form its own opinion as to the value of the subject property . . . ." *Id.* (citing *In re Karakas*, 2007 WL 1307906, at *6, 2007 Bankr.LEXIS 1578, at *5) (quoting *In re Richards*, No. 97–14798DWS, 1999 WL 14680, at *7, 1999 Bankr.LEXIS 22, at *7 (Bankr.E.D.Pa. Jan. 12, 1999)).

The Plaintiffs bear the burden as the moving party to demonstrate that "there is not even one dollar of value" in the Property to support the lien which the Plaintiffs seeks to avoid. *In re Karakas*, 2007 WL 1307906, at *6, 2007 Bankr.LEXIS 1578, at *6 (citing *In re Fisher*, 289 B.R. 544, 547 (Bankr.W.D.N.Y.2003)); *see In re Dziendziel*, 295 B.R. 184, 188 (Bankr. W.D.N.Y.2003). Once the Plaintiffs' burden has been met, the Defendant must

submit sufficient evidence to overcome the Plaintiffs' valuation. *In re Karakas*, 2007 WL 1307906, at *7, 2007 Bankr.LEXIS 1578, at *7.

### Determination of Secured Status

Section 506(a) of the Code governs the extent to which a claim is secured and prescribes how to value a secured creditor's collateral. When valuing real property, § 506(a)(1) instructs that "such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use on a plan affecting such creditor's interest." That provision does not specify how property value should be ascertained. Both experts who testified in this proceeding sought to determine the Property's fair market value. Yet, the experts reached sharply different conclusions as to what the market value is for the Property; there is a $60,000 difference between their valuations. The experts did define "fair market value" in the same way. Each report defines fair market value as:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure to the open market. . . .

(Pl. Ex. A, Def. Ex. A)

Orlowski's lower valuation of $50,000 is based on a comparison between the Property and three homes sold at mortgage foreclosure sales. At trial, Plaintiff's expert, Orlowski, was asked why he relied only on distressed sales in making his report. He responded the only properties comparable to the Property involved distressed sales, either foreclosure or REO sales. Orlowski testified that he could not find a comparable property that was sold at arms' length.

There is reason to be skeptical of that view. Defendant's expert, Farrelly, identified two arms' length sales. Farrelly's report recognized that foreclosure sales are a factor in the market where Property is located. His report states, "115 of 317 sales were [real estate owned, or "REO"] [1] or Short Sales. These sales often offer purchasers a large saving [sic]. The REO sales have impacted the market in several ways. First, the inventory of properties for sale has increased. Those properties that are not distressed are selling at or below original purchase price and often times sell below the median sales price in the market." (Def. Ex. A, at 8) Perhaps to account for the effect on the local market, Farrelly included a property sold in a short sale (Comparable No. 3). That property was sold for $120,000.

The analysis here must first define the relevant market for the Property. Some bankruptcy judges have held that when a debtor intends to retain a principal residence, the property is to be valued at its fair market value by comparing similar

---

1. "Real Estate Owned" property refers to property owned by a lender after an unsuccessful sale at a foreclosure auction. *Johnston v. SunTrust Bank (In re Johnston)*, 2013 WL 1844751, at *2 n. 2, 2013 Bankr.LEXIS 1850, at *4 n. 2 (Bankr.W.D.Va.2013) When a property is real estate owned the lender will then attempt to sell the property on its own.

arms' length transactions and without reliance on foreclosure sales. *In re Strever*, 468 B.R. 776 (Bankr.D.S.C.2012); *In re Williams*, 480 B.R. 813 (Bankr.E.D.Tenn. 2012); *In re Duncan*, No. 08–8807–AJM–13, 2008 WL 5333561, 2008 Bankr.LEXIS 3660 (Bankr.S.D.Ind. Dec. 18, 2008).

Those holdings rely in part on the United States Supreme Court opinion in *Assoc. Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). In *Rash*, the chapter 13 debtors sought to retain possession and use of a vehicle securing a lien in favor of a creditor. *Id.* at 955, 117 S.Ct. 1879. The issue was establishing the amount of the secured claim to determine how much the debtors had to pay the creditor to confirm their plan and keep the vehicle. *Id.* The debtors argued in favor of the foreclosure value. *Id.* The creditor argued in favor of the replacement value of the vehicle. *Id.* The *Rash* Opinion found that given the "proposed disposition or use" language in § 506(a), the actual proposed disposition or use of the collateral in dispute was of "paramount importance to the valuation question." *Id.* at 962, 117 S.Ct. 1879. As with the Plaintiffs in this case, the debtors in *Rash* chose to keep the collateral and according to the Opinion, "[t]hat actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use.'" *Id.* at 963, 117 S.Ct. 1879.

■ Following the reasoning in *Rash*, foreclosure value is appropriate only when the debtor proposes to surrender collateral to a creditor because the motivation is to release possession of the property. *In re Strever*, 468 B.R. 776, 780 (Bankr.D.S.C. 2012). However, when a debtor intends to keep the property, the fair market value is appropriate because the debtor finds more value in retaining the property. *Id.*

Some opinions have held that if a Chapter 13 debtor intends to retain a principal residence and is attempting to strip off a second mortgage, then that property's fair market value should be determined without relying on foreclosure sales of comparable properties when evaluating a secured party's secured status under § 506(a)(1). *In re Serda*, 395 B.R. 450, 454–55 (Bankr. E.D.Cal.2008); *see also Lepage v. Bank of America (In re Lepage)*, Nos. 8–10–74093–reg, 8–10–08287–reg, 2011 WL 1884034, 2011 Bankr.LEXIS 1842 (Bankr.E.D.N.Y. May 18, 2011). Those opinions reasoned that the fair market value best represents what a principal residence is worth to a debtor because it is the price that the residence would likely sell for in an arm's length transaction. The *Serda* Opinion compared the differing sale motivations of homeowners and foreclosing banks:

> Generally, an owner-occupant will try to realize the highest and best price for her property in an open market. Conversely, a bank-owned property is marketed to liquidate the bank's inventory of foreclosed properties and minimize the bank's losses in a time of economic stress . . . . The court cannot assume that the bank is a "willing seller under no compulsion to sell." A bank simply does not have the same incentive to market a foreclosed property as patiently as an owner-occupant, or to necessarily realize the highest and best price . . . .

> The Debtor argues that the bank-owned properties are part of the overall market and must be considered proportionally in any formula for valuing the Residence. However, that argument assumes that bank-owned properties are marketed the same and tend to attract the same buyers as owner-occupied properties.

*Serda*, 395 B.R. at 454–55.

Foreclosure sales will generally affect the market adversely. One opinion rea-

soned that "[t]he presence of distressed sale properties on the market, particularly a high volume of them, affects the value of all properties competing for sales. Their presence is likely to lower the asking price for properties being sold in arms' length transactions. Nonetheless, a seller of a foreclosed home is likely to be motivated to sell for a lower price than a sale between two willing individuals in an arms' length transaction." *Strever*, 468 B.R. at 782.

This realistic view suggests that Plaintiffs' expert's valuation is less credible because it relied exclusively on distressed sales. As explained above. Orlowski testified that there simply were no other properties comparable to the Plaintiffs' that were not involved in distressed sales. Yet, Defendant's expert, Farrelly, was able to identify at least two properties that were sold at arms' length in the Plaintiffs' neighborhood. Farrelly also included a distressed sale in his report. Orlowski did not account for those sales made at arms' length in his report. Although the relevant real estate market was impacted by foreclosures and other distressed sales, sales of those types did not account for all of the market. The report of Defendant's expert Farrelly more credibly reflects the entire relevant market.

█ Plaintiffs questioned whether the comparables used by Defendant's expert are sufficiently similar to Property to reach its accurate value. The properties used by Defendant's expert were different from that of the Property. Comparables Nos. 4 and 5 were active listings, not sales. Bankruptcy judges have been as resistant to use of active listings as comparables as with use of foreclosure sales. Opinions reason that most properties sell for below the listing price. *Strever*, 468 B.R. at 781. Adjusting active listings for the sake of comparison is difficult because it is difficult

to gauge how much lower than the listing price a given home will actually sell for. *Id.* at 782. "Such a determination seemingly depends on many subjective motivations of the seller that are unknown to the appraiser." *Id.* For these reasons, Farrelly Comparables Nos. 4 and 5 lack credibility as comparables in valuing the Property.

█ At trial, Farrelly was also questioned about the dates of sales of his other comparables. There was some dispute as to the relevant valuation date but only one opinion was cited on that issue, *Marsh v. U.S. Dep't of Hous. & Urban Dev. (In re Marsh)*, — F.Supp.2d —, —, 2013 WL 979299, at *6 (N.D.Ill. Mar. 13, 2013). In *Marsh*, the District Judge held that the relevant date for valuation under § 506(a) is the date of the filing of the bankruptcy petition. *Id.* There is no reason to dispute that well reasoned conclusion. In any event, neither expert provided evidence as to the value of the Property on the exact date of the bankruptcy petition. Two comparables available for use (Farrelly Comparables Nos. 1 and 3) were sold in September 2012, approximately five months after the Plaintiffs filed for bankruptcy protection. Comparable No. 2 was sold in June 2012, even closer to the petition date. The sales of these comparables are closer in time to the petition date than that used by Plaintiffs' expert. One of Orlowski's comparables was sold thirteen months in advance of the petition date. (Orlowski Comparable No. 3) Sale of the Orlowski comparable closest in time to the petition date occurred approximately six months before the petition date. (Orlowski Comparable No. 2) The time gaps between sales and the bankruptcy filing may raise questions of weight to be given to those sales but there is no basis to exclude any comparable on the basis that it was not sold on the exact date of the Plaintiffs filed for bankruptcy.

Plaintiffs' counsel attempted to highlight the differences in condition between the Property and Farrelly's comparables. Plaintiff Ignacio Hernandez testified to limited physical defects including: bent aluminum siding, squeaky floors, and a leaky roof not identified in Orlowski's expert report. Mr. Hernandez further testified that the Property did not require major renovations but could use some new paint. He stated that the Property had not been updated or remodeled in the five years before the bankruptcy filing. Farrelly's Comparable No. 1 was in better condition than that of the Property. Farrelly testified that Comparable No. 1 was rehabbed before sale. In his report, Farrelly gave Comparable No. 1 a higher "condition rating" than the Property. The "condition rating" of Comparable No. 1 in the expert's opinion provides that "[t]he improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained." Farrelly adjusted the actual sales price of Comparable No. 1, in part based on its superior condition to that of the Property. The difference between Comparable No. 1 and the Property has not been shown to be so great as to eliminate Comparable No. 1 from the analysis.

On cross-examination, Farrelly was questioned about his use of brick house sales as comparables. Of the five properties that Farrelly chose to compare to the Property, four had brick siding. As noted above, the Property has aluminum and shingle siding. Farrelly testified that brick siding was not more important or valuable in a valuation analysis. This testimony conflicted with that of Orlowski, who testified that brick siding would fetch a higher price because it is more durable, fire resistant, and generally better insulated. There is some appeal to the argument that use of brick houses as comparables should require discount of the appraisal but no evidence was presented that enables a calculation of such possible discount.

Based on the entire record, it is found that Plaintiffs have not met their burden to submit credible evidence as to their asserted value of the Property. Farrelly's report is more credible than Orlowski's as it relies on sales of comparable properties made at arms' length. In addition, his comparables were not shown to be so dissimilar to the Property as to warrant exclusion from analysis. In averaging the sales prices of Farrelly Comparables Nos. 1, 2, and 3, the value of the Property is held to be $110,000 ($112,817 rounded to nearest ten thousand).

### CONCLUSION

It is found that the amount owed on the First Mortgage held by Defendant in the amount of $55,850.91 does not exceed the value of the Property that is found to be $110,000. Defendant's Second Mortgage in the amount of $92,698.10 is partially secured and therefore it may not be stripped off by Plaintiffs. Only Defendant's Third Mortgage in the amount of $5,000 is wholly unsecured and will be voided by separate judgment order based on authority cited above.